IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VINCENT J. DESANTIS         :

                                    :

    v.                           :  Civil Action No. DKC 20-3165

                                    :

MAYOR & CITY COUNCIL OF
BALTIMORE, ET AL.            :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case is the corrected motion for summary judgment filed by Defendants Mayor and City Council of Baltimore (the "City"), Channa Williams, and Troy Brogden (collectively, the "Defendants"). (ECF No. 55). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion for summary judgment will be granted.[1]

---

[1] Plaintiff also styled his response to Defendants' motion for summary judgment as a cross-motion to strike Defendants' motion for having been filed after the dispositive motion filing deadline. (ECF No. 57 at 22). The deadline was midnight on March 24, 2022, (ECF No. 50), and Defendants filed their motion at 1:24 AM on March 25, 2022. Plaintiff also filed his response late; the deadline for his response was May 23, 2022, (ECF No. 53), and he filed it at 10:22 PM on May 24, 2022. Neither party sought an extension, but the delays were insignificant, and this court will rule on the merits of the motion.

I.    **Background**

Plaintiff Vincent DeSantis, also known as Justin DeSantis, is a white male of Italian and German descent who is over the age of forty.  Plaintiff worked at the Baltimore City Department of Public Works (the "DPW") as a fiscal technician, an accountant, and then an accountant supervisor for over twenty years before he was terminated in May 2019.  (ECF Nos. 55-4 at 3-4, 1 at 3, 9 at 2). He asserts that he has been diagnosed with Lyme Disease, which causes him joint pain, memory loss, confusion, and other symptoms. (ECF No. 1 at 4).  At the time of Plaintiff's termination, he was supervised by Defendants Channa Williams, an Operations Manager, and Troy Brogden, a Chief Financial Officer.  (ECF Nos. 1 at 3, 9 at 2).  Ms. Williams is a black female, and Mr. Brogden is of mixed-race heritage.  (ECF Nos. 1 at 3-4, 9 at 2, 55-7 at 2).

    **A. Plaintiff's Version of Events**

According to Plaintiff, his mistreatment at work began in late 2017.  The first incident he describes occurred on December 6, 2017, when Mr. Brogden reprimanded Plaintiff about his failure to sign in.  (ECF Nos. 1 at 4, 57 at 6-7).  Another employee had inadvertently signed over his name, and when Plaintiff tried to explain this, Mr. Brogden "screamed at" Plaintiff.  (ECF No. 57 at 6).  This incident will hereinafter be referred to as the "Sign-In Incident."  Another employee witnessed this occur and sent an email to Plaintiff several weeks later, recounting the incident.

(ECF No. 60-1).  She described Mr. Brogden's manner of speaking as "inappropriate" and said that it "ma[de] for a very hostile workplace environment."

Soon after, Plaintiff missed work for scheduled leave.  (ECF Nos. 1 at 4-5, 59-6 at 2-3).  Because of a rescheduled doctor's appointment, he needed to miss work on December 28 in addition to the days for which he had already received approval.  He tried to send an email to advise Ms. Williams of this, but it was never sent.  He later submitted a time slip with the leave request attached.  Ms. Williams questioned the authenticity of the leave slip he had submitted, and he received a five-day suspension. Plaintiff appealed the suspension, and it was reduced to one day, but after he appealed the one-day suspension, the five-day suspension was reinstated.

A number of other incidents occurred around that same time. On one occasion, Ms. Williams "sneered that the time in which Italians would be running the City was over," which Plaintiff interpreted as disparaging his Italian lineage.  (ECF No. 59-6 at 1).  On another occasion, Ms. Williams disciplined him, with a one-day suspension, for leaving early to pick his son up from school when the schools closed early due to snow.  (ECF No. 59-6 at 3).  Plaintiff was also reprimanded for missing a meeting, although he did attend the meeting by phone.  (ECF No. 59-6 at 3). Another employee witnessed an occasion where Ms. Williams "kept

stepping in [Mr. DeSantis's] path and trying to force him into the conference room" to meet with her and Thomas Pointer, the Human Resources Manager.  (ECF No. 59-7 at 8-11).

Plaintiff states that he filed "a complaint of harassment against the City and his supervisors internally and then with the Maryland Commission on Civil Rights" and that the discipline he received only began after he did so.  (ECF Nos. 57 at 21, 60-11 at 3).  He represents in his complaint that the internal complaint was filed "shortly []after" the Sign-In Incident and that the state complaint was filed on April 27, 2018.  (ECF No. 1 at 4-5).  However, he has not provided copies of those complaints or any details about what they contained, how they were handled, or who was aware of them.

Plaintiff requested a transfer to another office location; he was transferred in February 2018 but remained under the supervision of Ms. Williams.  (ECF No. 59-6 at 2).  The new location was, according to Plaintiff, "the worst possible location" because he lacked the resources he needed to get his job done.  Although it is unclear exactly when, at some point before his transfer, Plaintiff told Ms. Williams that he needed a reasonable accommodation for his Lyme Disease symptoms.  (ECF No. 59-6 at 3).  However, she did not act on this request until he was transferred back to his original office location in 2019.  (ECF No. 59-6 at 3-4).

In April 2019, Plaintiff began a process of developing reasonable accommodations for his Lyme Disease symptoms with the Americans with Disabilities Act Coordinator ("ADA Coordinator"), Phillip Chery. (ECF No. 59-6 at 4). Around this same time, Ms. Williams and Mr. Brogden asked to meet with Plaintiff to discuss his position description and any additional training he would need. Mr. Chery requested that they wait to hold that meeting until it was determined what accommodations he would need, but they scheduled a meeting on May 1, 2019, (the "May 1 Meeting"), on the same day as Plaintiff's scheduled meeting with Mr. Chery. Plaintiff attended the meeting with Mr. Chery and the May 1 Meeting.

The May 1 Meeting was where everything came to a head. The meeting occurred in Mr. Brogden's office, but Mr. Brogden was not present; Ms. Williams, Mr. Pointer, and Plaintiff attended the meeting. (ECF No. 59-6 at 4). Ms. Williams and Mr. Pointer discussed discipline for Plaintiff's failure to provide a revised position description, as they had requested, and Plaintiff refused to sign the discipline form. The discussions became tense. At some point, Ms. Williams left the room, and Plaintiff locked the door to prevent her from returning. Ms. Williams later re-entered and then left again, and Plaintiff locked the door a second time. When Ms. Williams tried to re-enter again after that, Mr. Pointer directed Plaintiff to unlock the door. Then, "Ms. Williams, while

attempting to push the door in to re-enter, felt the door unlock and then pushed the door in towards [Plaintiff]. [Plaintiff] never touched the door. Mr. Pointer was never standing between [Plaintiff] and the door." (ECF No. 59-6 at 5). Hereinafter, this incident will be referred to as the "Door Incident."

### B. Defendants' Version of Events

According to Defendants, Plaintiff's work performance started becoming an issue in 2015, when he was supervised by Pedro Aponte. Mr. Aponte kept notes of problems he was having with Plaintiff starting in October 2015, including times when Plaintiff was "[n]ot in his office," took long lunch breaks, submitted incorrect or late timesheets, missed meetings, and "mocked" Mr. Aponte's accent. (ECF No. 55-18). Mr. Aponte did not issue formal discipline to Plaintiff. However, he gave Plaintiff an overall performance rating of 3 out of 5 for his 2015-2016 Annual Performance Evaluation. (ECF No. 55-19 at 10). The evaluation contained comments such as, "Employee demonstrate[s] no integrity, accountability[,] or efficiency related to work schedule. The employee takes extensive breaks during work hours, extensive lunch breaks, has neglected requests to share his calendar with supervisor, uses work time to perform personal activities (trim nails)"; "The employee has no desire for changing, cannot manage under pressure situations, and has aggressive behavior when contradicted"; and "Employee has no consideration[] for coworkers,

6

provides uncomfortable work environment at times[,] and has regular disruptive behavior."

Ms. Williams became Plaintiff's supervisor in December 2016. (ECF No. 55-6 at 2). According to Ms. Williams, Plaintiff "made clear from [their] first interaction that he did not intend to respect [her] as a supervisor." (ECF No. 55-6 at 3). Ms. Williams gave Plaintiff a 2 out of 5 for his 2016-2017 Annual Performance Evaluation. (ECF No. 55-21 at 10). The evaluation contained comments such as "Justin needs to improve on his team building and appropriate interactions with team-[members]. There have been [occasions] where he has spoken in a very inappropriate and unprofessional tone with teammates [that] had questions about his work product"; "Justin needs to work on his ability to resolve conflict"; "Justin needs to work on following the chain of command as it relates to external commun[i]cations and business processes"; and "Justin is not very adaptable to change."

The following year, Ms. Williams gave Plaintiff a 1 out of 5 on his Annual Performance Evaluation. (ECF No. 55-22 at 32). The 2017-2018 evaluation contained comments such as "Justin fails to do these tasks timely, and his work is error prone"; "Justin is not accountable for his actions"; "His tone verbal and via correspondence is most inappropriate. His communications with colleagues are poor. There have been multiple incidents where Justin was pulled aside to discuss how he speaks to people in

7

meetings and via email correspondence"; "Many peers and coll[e]ages have requested for Justin to be removed from working with them because of his tone and his abrasive comments"; "Justin is not a team player. He reports to team meetings late, if he attends at all"; and "Justin speaks in a condescending and aggressive tone constantly."

Ms. Williams issued Plaintiff a five-day suspension in December 2017 for altering a previously-signed leave slip to say that the approved return-to-work date was December 29 rather than December 28. (ECF Nos. 55-6 at 5, 55-25, 55-26). Ms. Williams emailed Plaintiff on December 28, asking where he was. He forwarded her an email that he purported to have sent two days prior requesting for the additional day off, but Ms. Williams had not received it. (ECF No. 55-6 at 5). Plaintiff subsequently submitted a leave slip that stated he was approved for leave until December 29, but he later admitted to having altered the slip. (ECF No. 55-6 at 5, 55-29 at 6-7). Pursuant to civil service policy, Plaintiff was issued a five-day suspension, but Mr. Brogden reduced it to one day. However, Plaintiff appealed the one-day suspension, and the five-day suspension was upheld and reinstated. (ECF No. 55-29).

On January 31, 2018, Ms. Williams sent an email to Mr. Pointer and another Human Resources employee, complaining about Plaintiff's conduct. (ECF No. 55-31). The email stated that

Plaintiff's behavior had created a "hostile work environment," that he had "raised his voice excessively and aggressively towards [her] and other City employees" on multiple occasions, that he had "inappropriately grabbed [her] after [she] instructed him not to touch [her]," and that "[h]is behavior [was] progressively getting worse," among other things.  Around that same time, at least seven other employees expressed similar concerns in written statements to either Ms. Williams or the Human Resources Department.  (ECF No. 55-32).

At Plaintiff's request, he was transferred to another office location in February 2018.  However, Ms. Williams remained his supervisor.  On March 26, 2018, Ms. Williams issued Plaintiff a series of discipline letters.  First was a one-day leave reduction and a written warning for failing to complete a revenue report by a March 20, 2018, deadline after an extension was given. (ECF No. 55-36).  Ms. Williams issued Plaintiff another one-day leave reduction and written warning on March 26, 2018, for using "unprofessional language" about her in an email to another employee on March 12, 2018—specifically, he wrote that Ms. Williams's "approach" to capital transfers was "myopic" and "very narrow-minded."  (ECF No. 55-38).  Ms. Williams issued Plaintiff a one-day suspension for leaving early during a storm on March 20, 2018—Plaintiff sent Ms. Williams an email saying, "I am leaving early to avoid the bad weather that is approaching," and Ms. Williams

responded that liberal leave had not been issued by the City, but Plaintiff left early anyway. (ECF No. 55-40). Plaintiff appealed all three disciplinary actions, and Mr. Brogden reduced each of them to written warnings or "Non Infraction Occurrence[s]". (ECF Nos. 55-37, 55-39, 55-41).

Another employee filed a complaint on two separate occasions—March 20, 2018, and April 3, 2019—about Plaintiff's conduct toward her that made her feel uncomfortable. (ECF Nos. 55-33, 55-34). After an investigation by Mr. Chery, he recommended that the two "remain[] separated and report to work at different locations." (ECF No. 55-35). After the second incident, the manager at the office to which Plaintiff had transferred requested that Ms. Williams "find another location for Mr. Desantis to work permanently," noting that the incident "[wa]sn't the first problem [they had] had with him" at that office location. (ECF No. 55-45). Plaintiff was transferred back to his original office location in April 2019.

On August 31, 2018, Plaintiff attended a meeting with Ms. Williams, Mr. Brogden, and others to discuss some of the issues involving Plaintiff. (ECF Nos. 55-6 at 7, 55-44 at 5). At the meeting, it was determined that Plaintiff would receive a revised position description and any additional training that the new description may require. However, no one followed up until April 16, 2019, when Ms. Williams provided Plaintiff with a revised

10

position description and asked that he provide a response to it. (ECF No. 55-6 at 7). On April 29, 2019, Ms. Williams sent Plaintiff an email requesting again that he provide a response to the revised position description by the end of that day. (ECF No. 55-44 at 5). In this email, she referenced the fact that "[a]ll of [Plaintiff's] ADA equipment ha[d] been delivered with the exception of [his] chair[,] which [was] in route," adding that "[a]ll accommodations, leave[,] and FML [had] been granted to [him] as requested."

Mr. Chery, the ADA Coordinator, who was copied on that email, responded requesting that any action on a revised position description be "held back as a temporary accommodation" until after his meeting with Plaintiff, scheduled for May 1, 2019, to discuss potential reasonable accommodations for his disability. (ECF No. 55-44 at 4). He added that he was not familiar with the accommodations Plaintiff was receiving and wanted "the opportunity to discuss this with the employee to ensure that the agency is meeting his ADA request." It is unclear when Plaintiff first requested disability accommodations—according to Mr. Chery, another employee contacted him in April 2019 saying he or she believed Plaintiff might need an accommodation. (ECF No. 55-48 at 4).

Ms. Williams and Mr. Chery engaged in additional email responses in which they disagreed over whether it was necessary to

11

wait to move forward with discussions about Plaintiff's revised position description.  (ECF No. 55-44 at 2-3).  Ms. Williams requested a meeting with Mr. Chery, Mr. Pointer, and others to discuss "ongoing and documented" "challenges" with Plaintiff and to make sure they were "all on the same page before engaging." Mr. Chery responded that he could not "be part of any meeting to discuss any administrative, performance[,] or disciplinary issues outside of his ADA appointment."  He also requested that Ms. Williams provide documentation and dates of the prior ADA accommodations Plaintiff had received.  Ms. Williams responded that she was "trying to understand why Management requesting that Mr. DeSantis . . . respond to an email related to training should be 'held.'"  She added that Plaintiff could provide the documentation about his past ADA accommodation requests.

Ms. Williams scheduled a meeting on April 30, 2019, to discuss the revised position description with Plaintiff, but Plaintiff did not attend the meeting.  (ECF No. 55-6 at 7).  Ms. Williams and Mr. Pointer scheduled another meeting for May 1 to discuss the revised position description and Plaintiff's insubordination.  At the May 1 Meeting, a disagreement ensued, and Ms. Williams left the room.  (ECF No. 55-6 at 7-8).  Plaintiff locked the door to prevent Ms. Williams from re-entering, and Mr. Pointer instructed him to unlock the door.  (ECF No. 55-17 at 8-9).  According to Mr. Pointer, the door was still locked when Ms. Williams tried to re-

enter, so Mr. Pointer walked to the door to unlock it, while Plaintiff was still standing near the door. (ECF No. 55-17 at 10). Ms. Williams entered partially to ask if they were still talking, and it was confirmed that they were. According to Mr. Pointer, the following happened next:

> [Ms. Williams] was about to back out[,] and Justin pushed the door. I still had my hand on it and said, "Whoa, man, what are you doing?" The door almost hit Channa. I said, "What are you doing?" And he didn't say anything, and Channa came in and said, "Did you try to hit me with the door, and did you try to hit me with the door and why did you lock the door?" He said, "I didn't do neither." I said, "Justin, yes, you did. I saw you tried to push the door. Had I not stopped it, it would have hit her."

(ECF No. 55-17 at 10).

Ms. Williams recounted the Door Incident as follows: "When the door was unlocked and I attempted to re-enter, Mr. Desantis shoved the door back and forth as if to again close it in my face." (ECF No. 55-6 at 7-8).

### C. Termination Proceedings

Plaintiff was issued a Pre-Termination Memorandum on May 21, 2019, which was signed by Mr. Brogden. (ECF No. 55-51). The memorandum described the May 1 Meeting—specifically the Door Incident—and stated that Plaintiff violated the City of Baltimore's Workplace Violence Policy. The Workplace Violence Policy prohibits "acts or threats of . . . physical violence . . .

13

which involve or affect Baltimore City Government . . . employees."
(ECF No 55-15 at 2).  It provides that "[a]ny incident of assault
to another person(s), regardless of whether medical treatment is
required, shall result in disciplinary action ranging from a 5-
day suspension up to and including a recommendation for
termination."  (ECF No 55-15 at 7).  For threats of violence, the
policy recommends termination for a "[m]ajor [t]hreat" and a 5-
day suspension for the first incident of a "[m]inor [t]hreat."  A
major threat is defined as a "threat with the serious intention of
causing bodily harm or the possession of a weapon," and a minor
threat is defined as a "threat of bodily harm with no serious
intent or no possession of a weapon."  (ECF No 55-15 at 8).

Having found that Plaintiff violated this policy, in addition
to five civil service rules related to appropriate workplace
behavior and subordination to supervisors, the memorandum
suspended Plaintiff without pay, pending the outcome of a Pre-
Termination Conference.  The Pre-Termination Conference was held
on May 31, 2019, after which a memorandum was issued, formally
terminating Plaintiff for "violating the Workplace Violence
Policy."  (ECF No. 55-52).

Plaintiff appealed his termination to the City's Civil
Service Commission (the "Commission"), and a hearing was held
before a hearing officer.  After the hearing, the hearing officer
issued a recommendation on September 20, 2019, to overturn

Plaintiff's termination because there was "[i]nsufficient evidence" that Plaintiff "had the necessary intent to inflict serious bodily harm to Ms. Williams." (ECF No. 55-46 at 7). The hearing officer noted that a finding of a "minor threat" violation would be "more appropriate."

The City filed an exception to the hearing officer's recommendation. On November 26, 2019, the Commission determined that it did "not concur" with the hearing officer's recommendation that Plaintiff remain employed with the City, as it was too "narrowly tied" to the workplace violence rather than to "the totality of circumstances surrounding both workplace violence and [Plaintiff's] employment history with the City." (ECF No. 55-54). The Commission concluded that Plaintiff "created a toxic work environment, which caused other staff members to be fearful of [Plaintiff]," and that his "last set of actions were so egregious that his separation from the City is with merit."

**D. Procedural History**

Plaintiff filed the present lawsuit against Ms. Williams, Mr. Brogden, and the City on October 30, 2020, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII") in the form of race and gender discrimination, a hostile work environment, and retaliation; Titles I and V of the Americans with Disabilities Act ("ADA") in the form of failure to accommodate, disability discrimination, and retaliation; the Civil Rights Act of 1866, 42

U.S.C. § 1981 ("§ 1981") in the form of race discrimination; 42 U.S.C. § 1983 ("§ 1983") in the form of race discrimination; Maryland State Government Article § 20-601 in the form of disability, age, race, and gender discrimination and retaliation; and the Age Discrimination in Employment Act ("ADEA") in the form of age discrimination and a hostile work environment. (ECF No. 1).

On December 16, 2020, Plaintiff moved for voluntary dismissal of most of the claims against Ms. Williams and Mr. Brogden, leaving only the § 1981 and § 1983 claims against them. (ECF No. 7). Defendants filed an answer on January 6, 2021. (ECF No. 9). The parties engaged in discovery, and on March 25, 2022, Defendants moved for summary judgment on all counts.

## II.  Standard of Review

A court may grant summary judgment if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of

16

[his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)) (alteration in original).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).  However, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

## III. Analysis

### A. The City's Liability

As an initial matter, Defendants move for summary judgment on all claims against the City, other than the Maryland law claim, because "a municipality can be subject to liability for violations of federal civil rights only 'when it can be fairly said that the city itself, not its servants, is the wrongdoer.'"  (ECF No. 55-1 at 19-20 (quoting *Canton v. Harris*, 489 U.S. 378, 385 (1989))). Plaintiff does not respond to this argument.

Defendants are only partially correct.  It is true that a city cannot be held vicariously liable for the actions of its employees under § 1981 and § 1983.  *See Monell v. New York Dep't.*

*of Soc. Servs.*, 436 U.S. 658, 694 (1978) (§ 1983); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735-36 (1989) (extending *Monell*'s holding to § 1981).  Therefore, in order for the City to be liable under those statutes, Plaintiff would have to show that the violation of his rights was caused by an "official policy" or "governmental custom" of the City.  *Monell*, 436 U.S. at 690-91 (internal quotation marks omitted).  Plaintiff has identified no facts that suggest that any policies or customs were responsible for the discrimination he purportedly experienced, nor has he argued anything to that effect in his response to Defendants' motion for summary judgment.

Plaintiff's complaint alleges that "[t]he City's Workplace Violence Policy as instituted and applied deprived Plaintiff of his fundamental right to due process and resulted in his unlawful termination."  (ECF No. 1 at 11, 12, 14, 16, 17).  Plaintiff does not, however, challenge the policy itself but rather argues that Defendants inappropriately applied the policy by terminating him based on an incident that should not have resulted in a termination.  (ECF No. 57 at 1-2).  Even if he were to challenge the policy, there is no support for *Monell* liability.  When a policy is, as here, not facially unconstitutional, it can only be considered to have caused a violation if there is at least an "affirmative link" between the policy and the violation, and this causal link cannot "be established by proof alone of the single

18

violation charged." *Spell v. McDaniel*, 824 F.2d 1380, 1388 (4th Cir. 1987) (internal quotation marks omitted).  Plaintiff has not attempted to identify any proof of a pattern of discriminatory implementation of the Workplace Violence Policy.

Accordingly, summary judgment will be granted for the City on the § 1981 and § 1983 claims.  However, these principles do not apply to the other statutes in this case—indeed, the City, as the employer, is the only proper defendant for the Title VII, ADA, and ADEA claims.  *See Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510-11 (4th Cir. 1994) (holding that liability under the ADEA is limited to employers, not individual supervisors or other employees); *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180-81 (4th Cir. 1998) (same for Title VII); *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999) (same for the ADA).

**B. Title VII and the ADEA**

Under Title VII, it is unlawful for employers "to discharge . . . or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The ADEA prohibits the same employer conduct when done "because of such individual's age."  29 U.S.C. § 623(a)(1).  Here, Plaintiff alleges that the City violated Title VII and the ADEA by subjecting him to discrimination and harassment, such that a hostile work

environment was created, and by ultimately terminating his employment because of his race, sex, and age.

### 1. Hostile Work Environment

To survive summary judgment on a claim of race-based, sex-based, or age-based harassment under Title VII and the ADEA, a plaintiff must demonstrate that a reasonable jury could find that the harassment was "(1) unwelcome; (2) based on race[,] [sex, or age]; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." *Gilliam v. S.C. Dep't Of Juv. Just.*, 474 F.3d 134, 142 (4th Cir. 2007) (internal quotation marks omitted); *see also Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006).[2]  To establish that the harassment was based on race, sex, or age, the plaintiff must show that "'but for' his race[,] [sex,] or age, he would not have been the victim of the alleged discrimination." *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998).

Plaintiff argues that the way he was treated by Ms. Williams and Mr. Brogden, including the discipline he received, subjected him to a hostile work environment.  The facts, viewed in the light most favorable to Plaintiff, undoubtedly establish that an

---

[2] This court assumes without deciding, as the United States Court of Appeals for the Fourth Circuit has done, that a hostile work environment claim is cognizable under the ADEA for plaintiffs older than forty, as Plaintiff is here.  *See Baqir*, 434 F.3d at 746 n.14.

acrimonious relationship existed between Plaintiff and his supervisors. Arguably, Plaintiff's version of the facts support a conclusion that Ms. Williams and Mr. Brogden were unduly harsh and even abusive at times to Plaintiff, such as when he was purportedly "screamed at" for failing to sign in, or when he was purportedly punished for simply going to pick his son up from school during a snowstorm. However, even accepting each of Plaintiff's assertions as completely true, there is insufficient evidence to support a jury finding that Plaintiff's asserted mistreatment was because of his race, sex, or age.

Plaintiff has not identified any direct evidence that his supervisors' conduct towards him was motivated by race, sex, or age. There is no mention of comments about Plaintiff's sex or age in any of the parties' submissions. The only piece of evidence that potentially supports a conclusion that Ms. Williams had some racial animus towards Plaintiff was the comment she purportedly made about "Italians . . . running the City." However, Plaintiff has not described the context in which the comment was made, nor has he asserted that the comment was directed at him. He has also not asserted that this type of comment was ever repeated or was part of a pattern of racial animosity. As the Supreme Court has repeatedly held, "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' . . . does not sufficiently affect the conditions of employment to implicate

Title VII." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986)).  And the same goes for "simple teasing, offhand comments, and isolated incidents []unless extremely serious[.]"  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted).  Without any additional context, the comment cannot reasonably be characterized as "extremely serious," or "severe or pervasive."  Moreover, Plaintiff has not explained how a jury might reasonably conclude from this single comment that Ms. Williams's purported mistreatment of him was "based on" her animus toward people of Italian heritage.

Plaintiff could have attempted to show race-, sex-, or age-based animosity indirectly through his supervisors' differential treatment of similarly situated non-white, non-male, or younger employees, but he failed to do so, other than through unsupported assertions.  *See Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998).  Plaintiff's complaint describes "other employees outside of his protected class(es) being able to leave early to pick[]up their children with no consequence" on the day he was reprimanded for leaving early during a snowstorm.  (ECF No. 1 at 5).  It states repeatedly that he "was exposed to disadvantageous terms or conditions of employment to which other employees were not exposed."  (ECF No. 1 at 10, 12, 16, 17, 19).  And it states that

"Defendant[s] treated younger employees and those under the age of 40 more favorably than Plaintiff." (ECF No. 1 at 19).

However, in Plaintiff's response to Defendants' motion, he has not identified any evidence uncovered in discovery about the specific ways in which other employees were treated better than he. He did not, for example, point to depositions of any other employees in which it was established how they were treated by Defendants and whether they were similarly situated. When asked in his own deposition to identify non-Italian employees who were treated better than he, Plaintiff replied, "Everyone was treated better than me. Everyone had the benefit of their leave slips being signed and respond[ed] to. They were treated with respect. They weren't accused of not signing in when they had signed in such as what I did." (ECF No. 55-4 at 17). The fact that "everyone" was treated better is not evidence of differential treatment based on race, gender, or age, unless perhaps every other employee was not white, male, or over the age of forty (which Plaintiff has not asserted). Furthermore, a "plaintiff's own self-serving opinions" and "conclusory statements, without specific evidentiary support," are insufficient to support a claim of discrimination. *Id.* at 802; *Mackey v. Shalala*, 360 F.3d 463, 469-70 (4th Cir. 2004).

Plaintiff's work environment may have been stressful for him, and he may have been treated unfairly. However, Title VII and the

ADEA do not "guarantee a happy workplace, only one free from unlawful discrimination." *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997). Accordingly, Plaintiff's claims of a hostile work environment under Title VII and the ADEA cannot survive Defendants' motion for summary judgment.

### 2. Termination

Plaintiff also claims that he was terminated because of his race, sex, and age. To withstand summary judgment on a Title VII discriminatory termination claim when there is no direct evidence of a discriminatory motive, as is the case here, a plaintiff must engage in the four-part burden-shifting paradigm described by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). That is, a plaintiff must make a prima facie showing that: (1) he was a member of a protected class; (2) he was satisfactorily performing his job at the time of the termination; (3) he was terminated from his employment; and (4) he was discharged under circumstances that give rise to an inference of discrimination, such as where the misconduct that resulted in his termination was comparable in seriousness to misconduct of other employees outside the protected class who were not discharged, or where a similarly qualified person outside the protected class was chosen to fill the vacated position. *See Stewart v. Morgan State Univ.*, 46 F.Supp.3d 590, 598 (D.Md. 2014), *aff'd*, 606 F.App'x 48 (4th Cir. 2015); *Haynes v. Waste Connections, Inc.*, 922 F.3d 219,

223 (4ᵗʰ Cir. 2019); *King v. Rumsfeld*, 328 F.3d 145, 149 (4ᵗʰ Cir. 2003).  For ADEA claims, the framework is essentially the same, although courts often require as the fourth element that the plaintiff demonstrate that he was replaced by someone substantially younger.  *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4ᵗʰ Cir. 2006); *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312-13 (1996).  If a plaintiff successfully makes this prima facie showing, the burden of producing evidence shifts to the defendant, who must then come forward with evidence showing that the plaintiff was discharged for a legitimate nondiscriminatory reason.  *Haynes*, 922 F.3d at 223.  If the defendant meets that burden, the plaintiff must then demonstrate that the proffered reason is pretext for discrimination.  *Id.*

Plaintiff has not made this prima facie showing under either statute; while the first and third elements are undisputedly met, there are serious questions as to whether the second is.  In any event, he has not shown that the fourth element is met.

There is a paucity of evidence in the record showing that Plaintiff was performing his job satisfactorily at the time of his termination.  Plaintiff has only cited two documents in the record that contain positive reviews about his work.  The first is a deposition by a former chief of staff at the DPW, Kim Morton.  (ECF No. 59-5).  However, the portion Plaintiff references is, in Ms. Morton's words, her recollection of "general things from ten years

25

ago," and they were not entirely positive.   (ECF No. 59-5 at 4).
The second is his own affidavit, in which he states that "until
. . . 2017," he "had received nothing but accolades with respect
to [his] work performance," he had "received many compliments as
a result of [his] work," and he "had high evaluations."   (ECF No.
59-6 at 1).   Neither document shows anything about whether
Plaintiff's work performance was satisfactory *at the time of his
termination* in 2019.

The "satisfactory performance" element of the prima facie
case "does not require the plaintiff to show that he was a perfect
or model employee" but rather simply "that he was qualified for
the job and that he was meeting his employer's legitimate
expectations." *Haynes*, 922 F.3d at 225.   Setting aside the events
that occurred at the May 1 Meeting,[3] Plaintiff's increasingly poor
performance evaluations, complaints from supervisors and
coworkers, and disciplinary history create serious doubt as to
whether Plaintiff was performing satisfactorily at the time of his
discharge.   However, many of those reviews, complaints, and
disciplinary actions involved the same individuals he has accused

---

[3] "'[A] single instance of misconduct is more relevant to the
question of the employer's legitimate nondiscriminatory reason for
termination[ ]' than the employee's failure to meet the employer's
legitimate job expectations." *London v. Loyola High Sch. of Balt.,
Inc.*, No. 17-cv-2219-DKC, 2019 WL 4673436, at *4 (D.Md. Sept. 25,
2019), *aff'd*, 806 F.App'x 255 (4th Cir. 2020) (quoting *Gordon v.
Holy Cross Hosp. Germantown, Inc.*, 385 F.Supp.3d 472, 479 (D.Md.
2019)).

of discrimination, such that it is more difficult to rule out an inference of discrimination on their basis. *See London v. Loyola High Sch. of Baltimore, Inc.*, No. 17-cv-2219-DKC, 2019 WL 4673436, at *4 (D.Md. Sept. 25, 2019), *aff'd*, 806 F.App'x 255 (4th Cir. 2020).

It is unnecessary to rest a decision solely on the second element, however, because Plaintiff has not come forward with any evidence that would support an inference of discrimination. For example, he has not produced evidence of how other employees were disciplined for conduct similar to that for which he was terminated. Nor has he come forward with any evidence related to who was hired or promoted to replace him. The record is devoid of any references or incidents related to Plaintiff's race, sex, or age, other than perhaps the single, out-of-context comment regarding "Italians . . . running the City," which Plaintiff has not asserted was directed at him. Without any evidence that could support an inference of race-, sex-, or age-based animus through comparison with other employees or otherwise, there would be no basis for a jury to presume that Plaintiff's termination was "based on the consideration of impermissible factors," even before Defendants provide a reason for the termination. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). Therefore, Plaintiff has not established a prima facie case.

However, even assuming *arguendo* that Plaintiff had established a prima facie case, Defendants have come forward with ample evidence that his termination was for a legitimate nondiscriminatory reason. Plaintiff's annual evaluations reflect that his work performance worsened progressively each year, starting in 2015 when he was supervised by someone other than Ms. Williams. They also reflect that his supervisors were consistently expressing concerns about his professionalism and the appropriateness of his interactions with his superiors and fellow employees. Defendants have also produced several contemporaneous complaints from other employees about Plaintiff's behavior. Additionally, Mr. Pointer's and Ms. Williams's descriptions of the events that unfolded at the May 1 Meeting, as well as the Commission's determination that Plaintiff's "last set of actions were so egregious" under "the totality of circumstances," reflect Defendants' perception that Plaintiff's behavior at the May 1 Meeting was seriously inappropriate, that he threatened violence, and that the Door Incident was the final straw. The Door Incident, in the context of Plaintiff's employment history, is a legitimate nondiscriminatory reason for Plaintiff's termination.

Plaintiff is unable to show that Defendants' reasons are pretextual. Plaintiff places much emphasis on the differing testimonies of Mr. Pointer and Ms. Williams about what transpired during the May 1 Meeting—specifically, how the door was pushed and

when.  Inconsistencies in an employer's proffered discriminatory reasons can be evidence of pretext.  *Haynes*, 922 F.3d at 225.  But Defendants have always maintained that what occurred at the May 1 Meeting was the reason for Plaintiff's termination, even if Mr. Pointer's and Ms. Williams's recollections of the incident's precise chain of events are not entirely consistent.[4]

Plaintiff points to the fact that the hearing officer concluded that the incident did not warrant termination as additional evidence of pretext.  However, this court will not "sit as a super-personnel department weighing the prudence of employment decisions"; its role in this case is solely to determine whether discrimination occurred.  *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005) (internal quotation marks omitted).  Thus, whether the hearing officer's recommendation or the Commission's decision was the more correct

---

[4] Plaintiff also argues that "Pointer, Williams, and Brogden . . . contradict each other on who was responsible for the decision to terminate Mr. DeSantis."  (ECF No. 57 at 31).  Specifically, Mr. Brogden testified that he "d[id]n't think" that he had "any recommendation as to what" course of action to take in response to the Door Incident, yet an email in the record reflects that Mr. Brogden sent an email to Ms. Williams and others on May 1, 2019, saying, "I recommend termination for Mr. DeSantis."  (ECF Nos. 59-2 at 11, 62-1 at 2).  Mr. Brogden also testified that he did not write the Pre-Termination Memo (the Human Resources office did), although it was issued in his name.  (ECF No. 59-2 at 12).  It is unclear how these facts factor into the pretext analysis.  To the extent they reflect a minor dispute of facts regarding how exactly the termination procedures were carried out, the dispute is immaterial.

application of the civil service rules is irrelevant to this analysis. Ultimately, "when an employer gives a legitimate, non-discriminatory reason for discharging [a] plaintiff, 'it is not our province to decide whether the reason was wise, fair, or even correct, . . . so long as it truly was the reason for the plaintiff's termination.'" *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). Plaintiff may dispute whether the Door Incident justified his termination, but he has not produced evidence that it was pretext for discrimination.

Finally, Plaintiff also argues that pretext should be inferred from Defendants' attempt to justify the termination "post-facto" through evidence of Plaintiff's poor employment history. (ECF No. 57 at 4). However, the Commission's decision cited the "totality of circumstances surrounding both workplace violence and [Plaintiff's] employment history with the City" in upholding Plaintiff's termination, and the initial Pre-Termination Memorandum cited to civil service rules related to appropriate workplace behavior and subordination to supervisors as part of the reason for the disciplinary action. Indeed, Plaintiff's workplace misconduct is corroborated by a remarkable amount of documentation over several years as well as by many others not party to this lawsuit. But even if Defendants were not clear and consistent enough in stating their real reasons for terminating Plaintiff's

30

employment, Plaintiff cannot demonstrate pretext for the same reason that he could not establish a prima facie case: there is simply no evidence suggesting that the real reason was discrimination.  Ultimately, to succeed on a Title VII or ADEA claim, a plaintiff is tasked with showing "*both* that the [employer's] reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).  Thus, even if Plaintiff had come forward with enough evidence that might allow him to accomplish the first task at trial, he has certainly failed to do so for the second. Accordingly, summary judgment will be entered for Defendants on Plaintiff's Title VII and ADEA discriminatory termination claims.

### 3. Retaliation

Plaintiff claims that the treatment he received from his supervisors and his ultimate termination were also unlawful retaliation for his complaints of harassment.[5]  To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate "(1) that he engaged in protected activity, (2) that the employer took a materially adverse action against him and (3) there is a causal connection between the protected activity and the adverse action." *Perkins v. Int'l Paper Co.*, 936 F.3d 196,

---

[5] Plaintiff's retaliation claims appear to be brought only under Title VII and the ADA, not the ADEA.  The ADA retaliation claim will be discussed later in this opinion.

213 (4th Cir. 2019). "[P]rotected activit[ies]" include "participation" in a formal investigation or proceeding regarding alleged violations of Title VII as well as informal "opposition" to discrimination in the workplace. *Id.; see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). Once a prima facie case is established, the burden shifts to the defendants to articulate a legitimate, non-retaliatory justification for the adverse employment action, and if they do so, the burden shifts back to the plaintiff to demonstrate that the reason is pretextual. *Navy Fed. Credit Union*, 424 F.3d at 405.

In Plaintiff's affidavit, he describes that after the Sign-In Incident, he "complained to Mr. Brogden with respect to this harassment." (ECF No. 59-6 at 1). He adds: "Because Mr. Brogden and Ms. Williams had already been discriminating against me on racial grounds, and because Ms. Williams had already referred disparagingly to my Italian heritage, Mr. Brogden understood that my justified accusation of harassment was a complaint with respect to his racial discrimination against me."[6] Plaintiff also states that he "complained about [Mr. Brogden's] harassment . . . to [Mr. Brogden's] supervisor, Johnnie Hemphill" and that Mr. Brogden told

---

[6] It is unclear to what Plaintiff refers when he says that "Mr. Brogden and Ms. Williams had already been discriminating against [him] on racial grounds."

Plaintiff "that he did not appreciate [his] having gone to Mr. Hemphill."

An informal complaint about race discrimination to a supervisor is a protected activity under Title VII. However, Plaintiff has not provided any supporting documentation or evidence, aside from the above-quoted descriptions in Plaintiff's affidavit, that Plaintiff complained specifically about *racial* harassment, not just harassment. Plaintiff's bald assertion that Mr. Brogden "understood" that his complaints about the harassment were race-based is insufficient. Plaintiff does not explain how Mr. Brodgen or Ms. Williams were made aware that Plaintiff believed, at that point, that they were discriminating against him on racial grounds, based on the comment regarding "Italians . . . running the City" or anything else. The Sign-In Incident did not, on its face, reflect anything related to race.

He also cites a sentence from the letter his attorney wrote to the hearing officer during the administrative appeal of his termination. (ECF No. 57 at 21). His attorney wrote that "none of the City's alleged job-related behaviors or misconduct occurred until after Mr. DeSantis filed a complaint of harassment against the City and his supervisors internally and then with the Maryland Commission on Civil Rights." (ECF No. 60-11 at 3). Statements by Plaintiff's attorney, who presumably was not present to witness any of the complained-of mistreatment, do not provide any

meaningful evidence to support a prima facie case of retaliation. Plaintiff also cites the fact that "Williams admitted that Mr. DeSantis had alleged discrimination."   (ECF No. 57 at 30). However, the exhibit he cites, Exhibit 9 (ECF No. 59-4), which is Ms. Williams's deposition, does not contain any mention of discrimination or her awareness of Plaintiff's allegations thereof.[7]

Plaintiff's only other support for his Title VII retaliation claim is that he "had continually, and justifiably, alleged that [Mr.] Brogden had subjected him to a hostile work environment," which was corroborated by another employee who witnessed the Sign-In Incident; the fact that "Defendants were aware of his race"; and the fact that he "had not been shy in complaining about the Defendants' discrimination against him."   (ECF No. 57 at 30). Again, while Plaintiff may have complained about the Sign-In Incident, he has not produced any evidence that his complaints were of *racial* discrimination, and his bald assertions to the contrary in his response to Defendants' motion are insufficient.

Plaintiff asserts in his complaint that he filed a complaint with the Maryland Commission on Civil Rights on April 27, 2018, based on race, sex, retaliation, and disability, and that he named

---

[7] Plaintiff cites page 178 of that exhibit.  However, that page is not included in the excerpts Plaintiff has provided in the record.  This court cannot simply take Plaintiff's word for the fact that such an admission is in that missing page.

Mr. Brogden and Ms. Williams as responsible management officials. (ECF No. 1 at 5).  However, Plaintiff has not produced a copy of that complaint, any documentation related thereto, or any additional details about what it contained, how it was handled, and who was aware of it.[8]  Plaintiff does not even discuss the complaint in his affidavit, and other than the previously discussed passing reference in the quotation from Plaintiff's attorney, he does not discuss it in his response to Defendants' motion.  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings.'"  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)) (alteration in original).  Without more, the assertion in Plaintiff's complaint that he filed a state complaint alleging discrimination is not a sufficient basis for this court to conclude that he has established a prima facie case of retaliation.

Even assuming *arguendo* that Plaintiff had made out a prima facie case of retaliation based on his filing of the complaint

---

[8] There is a passing reference to the fact that Plaintiff filed a complaint with the Civil Rights Commission in the deposition of Ramona Harry, one of Plaintiff's coworkers. (ECF No. 59-7 at 14).  In the excerpt provided, Ms. Harry states that Plaintiff "told [her] that he had filed the complaint and he listed [her] as a witness," and that "no one ha[d] contacted her" regarding the complaint.  The excerpt does not contain any additional information about the nature of the complaint or its handling.

with the Maryland Commission on Civil Rights, the only complained-of conduct that occurred after April 27, 2018, was his termination. For the reasons previously discussed, Defendants have proffered legitimate nondiscriminatory reasons for his termination, and Plaintiff has not demonstrated that those reasons were pretextual. *See supra* Part III.B.2.   Therefore, Defendants are entitled to summary judgment on Plaintiff's Title VII retaliation claim.

### C. § 1981 and § 1983

Plaintiff has also brought claims under § 1981 and § 1983 against Ms. Williams and Mr. Brogden for race discrimination, based on the same conduct previously discussed.   Neither party has distinguished between those claims and the other statutory employment discrimination claims in their discussions of the case.

Section 1983 is not a general discrimination statute—it prohibits the deprivation of rights secured under federal law.   To state a proper § 1983 claim, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States," in addition to alleging state action.   *West v. Atkins*, 487 U.S. 42, 48 (1988).   Plaintiff has not identified, either in his complaint or in his response to Defendants' motion, the federal law that is the basis of his § 1983 claim.   If anything, he conflates it with his Title VII claims.   However, "a § 1983 action may not be based solely on a violation of rights created by Title VII."   *Onan v. County of Roanoke*, 52 F.3d 321 (Table), No. 94-

36

1770, 1995 WL 234290, at *3 (4th Cir. 1995).  In any event, having found no evidence of race discrimination under Title VII, the claim of race discrimination under § 1983 cannot withstand summary judgment.

The same goes for the § 1981 claim.  The same burden-shifting framework that applies in Title VII cases applies in discrimination cases arising under § 1981.  *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  Having found that Plaintiff did not establish a prima facie case of race discrimination under Title VII, summary judgment must be entered in Defendants' favor on Plaintiff's § 1981 claim as well.

## D. The ADA

Plaintiff alleges that the City violated the ADA when it failed to provide him reasonable accommodations, terminated him based on his disability, and retaliated against him for engaging in protected activities.

### 1. Failure to Accommodate

The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee."  42 U.S.C. § 12112(b)(5)(A).  In order to establish a prima facie case that an employer failed to make reasonable accommodations as required under the ADA, a plaintiff must show "(1) that he was an individual who had a disability within the

37

meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (internal quotation marks omitted) (alterations in original).

Plaintiff does not engage with the aforementioned elements in his response to Defendants' motion. (ECF No. 57 at 28-30). However, Defendants do not dispute that Plaintiff "had a disability" and that they "had notice of" it. Instead, they contend that Plaintiff could not perform the essential functions of the position even with a reasonable accommodation and that Defendants did not fail to accommodate him. (ECF No. 55-1 at 34-36). Plaintiff's failure to satisfy his burden to prove the elements of the prima facie case is troubling. However, this claim can be easily resolved by the fact that the City did not fail to accommodate Plaintiff—indeed, Plaintiff admits that it was engaging in the process of accommodating him up until his termination.

The ADA regulations provide that "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation[.]" 29 C.F.R. § 1630.2(o)(3). Mr. Chery, the DPW ADA Coordinator, met

with Plaintiff on May 1, 2019, to do just that; Plaintiff admits this.  (ECF No. 59-6 at 4).  Plaintiff does not assert that Mr. Chery denied his request for reasonable accommodations at that meeting or thereafter.  Instead, Plaintiff was terminated before the accommodation process was completed.

Plaintiff argues that he was denied reasonable accommodations in a number of ways: Ms. Williams's rush to hold the May 1 Meeting even though Mr. Chery had requested it be held after his meeting with Plaintiff; Ms. Williams's failure to fill out forms that Mr. Chery requested she fill out; and Ms. Williams's objection to Plaintiff's receipt of additional accommodations because he had already received accommodations he had requested.[9]  (ECF No. 57 at 9, 28-30).

---

[9] In passing, Plaintiff also laments the "hiatus" between when he asserts he first requested accommodations—prior to his transfer to the other office location—and when Ms. Williams acted on his request.  (ECF No. 57 at 9).  However, Plaintiff's complaint only contains a claim that Defendants failed to provide a reasonable accommodation, not that they delayed in doing so.  The complaint also only mentions Plaintiff's seeking accommodations in April 2019.  (ECF No. 1 at 6).  Even assuming it was a proper claim, Plaintiff has not come forward with enough evidence from which a jury could determine that there was a delay in providing accommodations; to start would be a description of the accommodations he requested prior to his transfer that Defendants purportedly delayed in providing him.  It is "[w]ell-settled law . . . that mere allegation of an employer's unreasonable delay in providing a reasonable accommodation to a disabled employee [i]s insufficient, standing alone, to defeat summary judgment under a failure-to-accommodate theory."  *Williams v. Fairfax Cnty.*, No. 21-CV-598(RDA/IDD), 2022 WL 2346615, at *8 (E.D.Va. June 29, 2022).  Therefore, this argument does not hold water.

First, Plaintiff's ADA claims are not brought against Ms. Williams—they are only against the City.  And the evidence Plaintiff has presented reflects that Mr. Chery, an employee of the City, dutifully followed the necessary steps to engage in an interactive process with Plaintiff until he was no longer able to do so because Plaintiff was terminated.

Additionally, the evidence Plaintiff has produced reflects that, notwithstanding Ms. Williams's purported attempts to derail the accommodations process, Plaintiff's meeting with Mr. Chery still occurred as scheduled.  And Plaintiff has not asserted that Mr. Chery denied his request for an accommodation at that meeting nor complained that the meeting did not reflect a good faith, ADA-compliant attempt at engaging in the interactive process.  He asserts in his response to Defendants' motion that, as a result of Ms. Williams's refusal to postpone the May 1 Meeting until after his meeting with Mr. Chery,[10] "the interactive process did not go through," but Plaintiff's own affidavit flatly contradicts this. (ECF Nos. 57 at 10, 59-6 at 4).  The evidence in the record and facts asserted by Plaintiff do not suggest anything other than that the interactive process was still ongoing at the time of

---

[10] Although not totally clear, it seems from Plaintiff's and Mr. Chery's affidavits that the May 1 Meeting *was* technically after the meeting with Mr. Chery, although on the same day.

Plaintiff's termination.[11]   Therefore, Plaintiff has not established a prima facie case that he was denied reasonable accommodations in violation of the ADA.

### 2. Termination

Plaintiff also claims that he was terminated because of his disability, in violation of the ADA.  To establish a prima facie case of a wrongful discharge under the ADA, a plaintiff must demonstrate that "(1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001). If he does so, the burden shifts to the defendants to articulate a legitimate nondiscriminatory reason for the termination, and if they do so, the plaintiff must then demonstrate that the proffered reason is pretext for discrimination.  *Ennis v. Nat'l Ass'n for Bus. and Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995).  For the same reasons previously discussed regarding the Title VII and ADEA discriminatory termination claims, Plaintiff has not made out a prima facie case under the ADA.  *See supra* Part III.B.2.

---

[11] Mr. Chery's affidavit supports this conclusion as well. (ECF No. 55-48 at 6).

Specifically, he has not come forward with any evidence that he was discharged under circumstances that give rise to an inference of discrimination, such as examples of non-disabled employees engaging in conduct similar to that for which he was discharged and receiving less-severe punishments, evidence that he was replaced by a non-disabled employee, or evidence otherwise of disability-based animus that his supervisors harbored.   Some courts have considered temporal proximity between a disclosure of disability and a termination to give rise to an inference of discrimination, *see Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 575 (4th Cir. 2015), but Plaintiff has stated that Defendants knew of his disability as early as January 2017, years before his termination.   (ECF No. 1 at 4).   And as before, Defendants have come forward with a legitimate nondiscriminatory reason for his termination, which Plaintiff has not shown to be pretextual.   *See id.*   Accordingly, Plaintiff's ADA discriminatory termination claim fails in the same way that his Title VII and ADEA discriminatory termination claims do.

### 3. Retaliation

Finally, Plaintiff asserts that his termination was retaliation for requesting reasonable accommodations, which is a protected activity under the ADA.   *See Haulbrook*, 252 F.3d at 706. To establish a prima facie case of ADA retaliatory discharge, a plaintiff must demonstrate "(1) that he engaged in protected

activity; (2) that his employer took an adverse action against him; and (3) that a causal connection existed between the adverse [action] and the protected [activity]." *Id.* If the plaintiff satisfies this burden, the defendants must articulate a legitimate nondiscriminatory reason for the termination, and if they do so, the plaintiff must then demonstrate that the proffered reason is pretextual. *Id.*

Here, unlike with his Title VII retaliation claim, Plaintiff has clearly established that he engaged in a protected activity under the ADA by seeking reasonable accommodations through his participation in the interactive process. And the termination was undoubtedly an adverse action. As for whether a causal connection existed between the protected activity and the adverse action, a temporal proximity between the two might at least create a question of fact. *See id.* According to Plaintiff's version of events, he first requested accommodations before he transferred office locations in February 2018, more than a year before his termination. However, given the uncertainty regarding the timeline of Plaintiff's request as well as regarding the circumstances surrounding the initiation of the formal process in April 2019, there may be a question of fact as to the causation element.

In any event, the question of fact is not material because, as previously discussed with regard to Plaintiff's Title VII and

ADEA claims, Defendants' proffered reasons for terminating
Plaintiff have not been rebutted effectively. *See id.*; *see supra*
Part III.B.2. Plaintiff has attempted to cast doubt by challenging
Ms. Williams's and Mr. Brogden's version of events regarding the
Door Incident, pointing to the disagreement by the administrative
reviewers as to whether that incident warranted termination, and
arguing that Defendants' reasons are "post-facto." However, he
has not been able to provide any evidence upon which a reasonable
jury could conclude that the events that occurred on May 1—in the
context of his long history of unsatisfactory performance reviews,
discipline, and acrimonious relationships with supervisors and
coworkers—were not the true reason for his termination and, more
importantly, that Plaintiff's request for a reasonable
accommodation was the true reason. Therefore, Defendants are
entitled to summary judgment on Plaintiff's ADA retaliation claim.

### E. Maryland State Government Article § 20-601

Plaintiff's complaint also contains a claim that Defendants
violated the Maryland Fair Employment Practices Act, Md. Code,
State Gov't § 20-601, et seq. (the "MFEPA"), through their
discrimination against Plaintiff on the basis of his disability,
race, gender, and age as well as for their retaliation against
him. Neither party discusses this claim in a way that
distinguishes it from the federal law claims in this case.

The MFEPA provides that employers "may not . . . discharge[] or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of . . . the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability[.]"  Md. Code, State Gov't § 20-606.  However, this court has routinely analyzed claims brought under the MFEPA using the same legal frameworks as claims brought under Title VII, the ADEA, and the ADA.  *See Payne v. Medstar Health, Inc.*, No. 21-cv-2841-RDB, 2022 WL 17584375, at *5 (D.Md. Dec. 12, 2022) (citing cases); *see also Dobkin v. Univ. of Baltimore Sch. of Law*, 210 Md.App. 580, 592-93 (Md. 2013) (citing cases) ("Maryland Courts have traditionally held that in employment discrimination actions, parties must engage in the four-part burden-shifting paradigm described by the United State Supreme Court in *McDonnell Douglas*[.]").  Therefore, for the same reasons previously discussed, Plaintiff's state law claim fails as well.

**IV.   Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment on all claims in the complaint will be granted, and this case will be closed.   A separate order will follow.

/s/

DEBORAH K. CHASANOW<br>
United States District Judge